IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

STEVEN RODRIGUEZ,

        Petitioner,               No. CIV S-04-2119 LKK GGH P

    vs.

MARK SHEPHERD, et al.,

        Respondent.[1]        FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  In 1983 petitioner was convicted of second degree murder and sentenced to 17 years to life.

        In the instant petition, petitioner challenges the 2001 decision by the California Board of Prison Terms (BPT) finding him unsuitable for parole.  This was petitioner's third suitability hearing.  The petition raises the following claims: 1) insufficient evidence to find him unsuitable (9 claims); 2) the BPT improperly classified his murder as first rather than second

_____

[1] "A petitioner for habeas corpus relief must name the state officer having custody of him or her as the respondent to the petition." Stanley v. California Supreme Court, 21 F.3d 359, 360 (9th Cir. 1994) (citing Rule 2(a), 28 U.S.C. foll. § 2254).  The court substitutes Mark Shepherd as respondent as he is the acting warden of the institution where petitioner is incarcerated.

1   degree; 3) violation of the Equal Protection Clause; 4) violation of the Americans with

2   Disabilities Act (ADA); and 5) regulations unconstitutionally vague.

3          After carefully considering the record, the court recommends that the petition be

4   denied.

5   II.  Anti-Terrorism and Effective Death Penalty Act (AEDPA)

6          The AEDPA applies to this petition for habeas corpus which was filed after the

7   AEDPA became effective. Neeley v. Nagle, 138 F.3d 917 (11th Cir.), citing Lindh v. Murphy,

8   117 S. Ct. 2059 (1997).   The AEDPA "worked substantial changes to the law of habeas corpus,"

9   establishing more deferential standards of review to be used by a federal habeas court in

10   assessing a state court's adjudication of a criminal defendant's claims of constitutional error.

11   Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

12          In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

13   Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

14   for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

15   between "contrary to" clearly established law as enunciated by the Supreme Court, and an

16   "unreasonable application of" that law. Id. at 1519.  "Contrary to" clearly established law applies

17   to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

18   Court on a point of law, or (2) if the state court case is materially indistinguishable from a

19   Supreme Court case, i.e., on point factually, yet the legal result is opposite.

20          "Unreasonable application" of established law, on the other hand, applies to

21   mixed questions of law and fact, that is, the application of law to fact where there are no factually

22   on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

23   Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

24   AEDPA standard of review which directs deference to be paid to state court decisions.  While the

25   deference is not blindly automatic, "the most important point is that an *unreasonable* application

26   of federal law is different from an incorrect application of law....[A] federal habeas court may not

1   issue the writ simply because that court concludes in its independent judgment that the relevant

2   state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

3   that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

4   1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

5   objectively unreasonable nature of the state court decision in light of controlling Supreme Court

6   authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

7            The state courts need not have cited to federal authority, or even have indicated

8   awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

9   Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

10  contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

11  unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

12  occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

13  established Supreme Court authority reviewed must be a pronouncement on constitutional

14  principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

15  binding only on federal courts.  Early v. Packer, 123 S. Ct. at 366.

16           However, where the state courts have not addressed the constitutional issue in

17  dispute in any reasoned opinion, the federal court will independently review the record in

18  adjudication of that issue.  "Independent review of the record is not de novo review of the

19  constitutional issue, but rather, the only method by which we can determine whether a silent state

20  court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

21  2003).

22           The Los Angeles County Superior was the last court to issue a reasoned decision

23  addressing petitioner's claims that the BPT lacked sufficient evidence to find him unsuitable.

24  Respondent's Answer, Exhibit B, pp. 96-97.  Accordingly, the court "looks through" the

25  summary dispositions of the California Court of Appeal and California Supreme Court to the last

26  reasoned decision, i.e. the opinion of the Superior Court, in determining whether the state courts

1   reasonably applied clearly established Supreme Court authority in denying petitioner's claim that

2   there was not sufficient evidence to find him unsuitable.  Shackleford v. Hubbard, 234 F.3d

3   1072, 1079 n. 2 (9th Cir. 2000) (citing Ylst v. Nunnemaker, 501 U.S. 797, 803-04, 111 S. Ct.

4   2590 (1991)).

5          No state court issued a reasoned decision addressing petitioner's remaining

6   claims.  Accordingly, the court will conduct an independent review of these claims.

7   III.  Discussion

8          A.  Insufficient Evidence

9          *California Parole Criteria*

10          Although due process does not require the existence of a parole scheme,

11   California has established one.  Not all of the myriad procedures of the parole setting system are

12   pertinent here.  The court sets forth that part of the statutory section that is pertinent:

13          (a) In the case of any prisoner sentenced pursuant to any provision of law, other
         than Chapter 4.5 (commencing with Section 1170) of Title 7 of Part 2, the Board
14          of Prison Terms shall meet with each inmate during the third year of
         incarceration for the purposes of reviewing the inmate's file, making
15          recommendations, and documenting activities and conduct pertinent to granting
         or withholding postconviction credit. One year prior to the inmate's minimum
16          eligible parole release date a panel consisting of at least two commissioners of
         the Board of Prison Terms shall again meet with the inmate and shall normally
17          set a parole release date as provided in Section 3041.5. The panel shall consist
         solely of commissioners or deputy commissioners from the Board of Prison
18          Terms.

19          The release date shall be set in a manner that will provide uniform terms for
         offenses of similar gravity and magnitude in respect to their threat to the public,
20          and that will comply with the sentencing rules that the Judicial Council may
         issue and any sentencing information relevant to the setting of parole release
21          dates. The board shall establish criteria for the setting of parole release dates and
         in doing so shall consider the number of victims of the crime for which the
22          prisoner was sentenced and other factors in mitigation or aggravation of the
         crime.

23

24   Cal. Penal Code § 3041.

25          In compliance with the statutory mandate, the Board of Prison Terms issued

26   regulations which guide it in finding prisoners convicted of life offenses with parole eligibility

4

for parole setting.  Cal. Code Regs. tit. 15, § 2402 sets forth the criteria for determining whether an inmate is suitable for parole.  Section 2402(a) provides that regardless of the length of time served, a prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

Section 2402(c) sets forth the circumstances tending to show unsuitability.  The court lists those of significance here:

(1) Commitment Offense.  The prisoner committed the offense in an especially heinous, atrocious or cruel manner.  The factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style manner.

*****

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History.  The prisoner has a history of unstable or tumultuous relationships with others.

*****

*****

(6) Institutional Behavior.  The prisoner has engaged in serious misconduct in prison or jail.

Section 2402(d) sets forth the circumstances tending to indicate suitability:

(1) No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to the victims.

(2) Stable Social History.  The prisoner has experienced reasonably

stable relationships with others.

(3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for the Crime.  The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome . . .

(6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.

(7) Age.  The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

California's parole scheme gives rise to a cognizable liberty interest in release on parole.  Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003).  But see discussion, infra at p. 11. Only one aspect of that liberty interest is of pertinence here:  "In the parole context, the requirements of due process are met if 'some evidence' supports the decision."  Id.  The evidence underlying the board's decision must have some indicia of reliability.  Id.

In Biggs, the Ninth Circuit indicated that a continued reliance on an unchanging factor such as the circumstances of the offense could result in a due process violation.  Biggs was serving a sentence of twenty-five years to life following a 1985 first degree murder conviction. In the case before the Ninth Circuit, Biggs challenged the 1999 decision by the BPT finding him unsuitable for parole despite his record as a model prisoner.  334 F.3d at 913.  While the Ninth Circuit rejected several of the reasons given by the BPT for finding Biggs unsuitable, it upheld three:  1) petitioner's commitment offense involved the murder of a witness; 2) the murder was

6

1  carried out in a manner exhibiting a callous disregard for the life and suffering of another; 3)

2  petitioner could benefit from therapy.  334 F.3d at 913.

3         The Ninth Circuit cautioned the BPT regarding its continued reliance on the

4  gravity of the offense and petitioner's conduct prior to the offense:

5
6
7
8
9
> As in the present instance, the parole board's sole supportable
> reliance on the gravity of the offense and conduct prior to
> imprisonment to justify denial of parole can be initially justified as
> fulfilling the requirements set forth by state law.  Over time,
> however, should Biggs continue to demonstrate exemplary
> behavior and evidence of rehabilitation, denying him a parole date
> simply because of the nature of his offense would raise serious
> questions involving his liberty interest.

10  334 F.3d at 916.

11         The Ninth Circuit stated that "[a] continued reliance in the future on an

12  unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs

13  contrary to the rehabilitative goals espoused by the prison system and could result in a due

14  process violation."  334 F.3d at 917.

15         Biggs is in conformance with the stated goals of California's parole establishment

16  system—that is, the goal is not to release persons who will be a danger to the community if

17  released.  Clearly, when looking at the commitment offense in terms of this goal, one would

18  attempt to use it for its predictive value.  The more violent, thoughtless, and callous the crime,

19  the more likely it could be said that the perpetrator would exhibit those tendencies again.  One

20  who not only killed, but excessively violated society's norms, is a person less likely to care about

21  those norms when released.  But, the purpose of prison, aside from punishment, is to determine

22  for parole eligibility purposes when, if ever, these presumptions have been confirmed or

23  rebutted.

24         The California Supreme Court, having once seemingly agreed with the Ninth

25  Circuit, see In re Rosenkrantz, 24 Cal. 4th 616, 683 (2002), stating that in order for the BPT to

26  put weight on the exceptional nature of the crime (murder), the murder had to be "particularly

1    egregious," has now defined that term as simply "that the violence or viciousness of the inmate's

2    crime must be more than *minimally necessary to convict him* of the offense for which he is

3    confined." In re Dannenberg, 34 Cal. 4th 1061, 1095, 23 Cal. Rptr.3d 417, 440 (2005).  Of

4    course, as the dissent in Dannenberg pointed out, this standard is completely unreviewable.  34

5    Cal. 4th at 1102, 23 Cal. Rptr. 3d at 446.  The minimal elements of the crime are simply that a

6    person dies at the hands of another with the perpetrator exhibiting the requisite intent.  *Any* fact

7    in addition to this could be one viewed as "more than minimally necessary to convict."  For

8    example, one BPT panel may believe that use of a knife per se causes undue suffering; another

9    may believe use of any weapon where death is not instantaneous, probably the vast majority of

10   murders, exhibits callousness.  A conclusion can easily be reached by those who want to claim

11   that the facts of *any* murder are such that they prove more than those facts minimally necessary

12   for a conviction.

13           There can be no doubt that Dannenberg gives carte blanche to the BPT to issue a

14   mere characterization of the crime to support a denial of parole.  For the due process issue, the

15   question is whether AEDPA insulates this authority from review in habeas corpus.  Clearly,

16   federal due process is not defined by all the intricacies of state law regardless of whether the state

17   law gives rise to the protectable liberty interest.

18           Although state laws may in certain circumstances create a
             constitutionally protected entitlement to substantive liberty
19           interests, see, e.g., Sandin v. Conner, 515 U.S. 472, 483-84, 115
             S.Ct. 2293, 132 L.Ed.2d 418 (1995); Tracy v. Salamack, 572 F.2d
20           393, 396 & n. 9 (2d Cir.1978) (per curiam), state statutes do not
             create federally protected due process entitlements to specific
21           state-mandated procedures. "Elevating a state-mandated procedure
             to the status of a constitutionally protected liberty or property
22           interest, would make process an end in itself rather than a
             requirement whose constitutional purpose is to protect a
23           substantive interest in which the individual has a claim of
             entitlement." Sealed v. Sealed, 332 F.3d 51, 57 n. 5 (2d Cir.2003)
24           (quoting Olim, 461 U.S. at 250-51, 103 S.Ct. 1741, and Doe v.
             Milwaukee County, 903 F.2d 499, 503 (7th Cir.1990).

25

26   Holcomb v. Lykens, 337 F.3d 217, 224 (2nd Cir. 2003).

1   All that federal law requires for parole hearing due process is that the inmate up

2   for parole consideration be given a hearing with minimal rights and that the decision be

3   supported by "some evidence."  Biggs, supra.  Because the federal due process in parole

4   suitability hearings arises from a liberty interest created by state law,[2] state courts are generally

5   free to define their law in connection with the liberty interests as the final arbiters of their state

6   law.  Thus, in general, if state courts desire to define their  state's parole criteria in a restrictive

7   fashion, the liberty interest is characterized by those restrictive holdings.

8   However, state courts may not interpret their law in such an arbitrary manner that

9   the interpretation is nothing but an evasion of the federal due process requirements, minimal as

10  they may be.  "[W]e are bound by the state's construction [of state laws] except when it appears

11  that its interpretation is an obvious subterfuge to evade the consideration of a federal issue."

12  Peltier v. Wright, 15 F.3d 860, 862 (9th Cir.1994); see also Oxborrow v. Eikenberry, 877 F.2d

13  1395, 1399 (9th Cir.1989) ("Our deference to the [state] Court is suspended only upon a finding

14  that the court's interpretation [of state law] is untenable or amounts to a subterfuge to avoid

15  federal review of a constitutional violation.").  The question ultimately to be decided here is

16  whether the Dannenberg interpretation is so unreviewable, i.e., the facts underlying *any* murder

17  can stand as "some evidence" to deny parole suitability, that the federal standard of "some

18  evidence" is, in essence, completely eviscerated.

19  The undersigned is mindful that a majority of justices on the California Supreme

20  Court in Dannenberg (4-3 decision) implicitly answered the question in the affirmative, although

21  federal due process and liberty interests were not at issue per se in that case.  Therefore, it would,

22  and should, be rare indeed that a lower court federal judge should find the decision of a state

23  supreme court to be an unreasonable application of clearly established Supreme Court authority.

24  The question goes so much further than whether the undersigned believes that the dissent had the

25

26  [2] Federal due process does not require that a state have a parole system.  Greenholtz v.
Inmates of Neb. Penal and Corr. Complex, 442 U.S. 1, 7, 99 S. Ct. 2100, 2104 (1979).

9

1  better of the argument.  Even clear error is insufficient.  That having been said, the undersigned

2  cannot find a justifiable reason to find that the determination was reasonable.

3         As it stands now, the law in California permits parole to be denied *solely* on the

4  basis of the nature of the crime.  "The nature of the prisoner's offense, alone, can constitute a

5  sufficient basis for denying parole."  In re Rosenkrantz, 29 Cal. 4th 616, 682, 128 Cal. Rptr. 2d

6  1104 (2002).  However, the historical facts of the crime will never change, and all prisoners

7  having been found to have committed a crime with facts "more than minimally necessary to

8  convict," i.e., nearly everyone, can have their life with parole case effectively transmuted to life

9  without parole—because the facts of the offense will never change.  Under present California

10  law, the BPT does not set the sentence, and therefore due process does not permit the BPT to

11  change the court imposed sentence either *de jure* or *de facto.*

12         But, one might argue, a later panel may ultimately assess the unchangeable facts

13  of the case differently than a previous panel, or two, or three, etc.  This argument, however, gives

14  no substance to due process notions.  The argument would expressly hinge due process on the

15  luck of the draw, that is, maybe (but doubtful) a panel will come along that will view the facts as

16  not more than minimally necessary to convict.  Compelling due process to hinge on such an

17  arbitrary factor is no due process at all.

18         One final argument could be made to support the Dannenberg standard.  The BPT

19  is not *compelled* to deny parole solely on the basis of the "aggravated" nature of the crime.  But

20  this argument does not cure the due process defect either.  Simply because some inmates may, at

21  essentially the sole discretion of the BPT, receive a parole eligibility finding despite the existence

22  of an unreviewable and standardless "nature of the crime" factor (and not many inmates

23  have)—does not mean that the factor is therefore constitutional when used to deny parole.  The

24  deficiency in the factor is in its standardless, meaningless application per se when used to deny

25  parole.   Due process in a particular case is adjudged on an individual, not statistical,

26  basis.  In other words, a due process violation against one person is not answered by reference to

10

1   another person who suffered no ultimate harm as a result of the violation.

2          Thus, the undersigned must continue to follow <u>Biggs</u>.  Repeated application of the

3   severity of the crime factor will violate due process when the crime for which incarceration was

4   required grows more remote.  Although the Ninth Circuit in <u>Biggs</u> did not explicitly state when

5   reliance on an unchanging factor would violate due process, it makes sense that reliance on such

6   a factor becomes unconstitutional when the factor no longer has predictive value.  The court

7   makes this determination on a case by case basis.[3]

8          The undersigned must relate that a district judge of this court believes that the

9   California parole scheme for indeterminate sentences does not create a federal liberty interest.

10  <u>Sass v. Cal. Board of Prision Terms</u>, __ F. Supp. 2d __, 2005 WL 1406100 (E.D. Cal. 2005

11  (Honorable Morrison England).  In <u>Sass</u>, Judge England found that no federal liberty interest was

12  created because the wording of the parole statute, Cal. Penal Code 3041(a) ("a panel *shall*

13  *normally* set a release date..) and §3041(b) ("the panel...*shall set* a release date....") was

14  insufficiently mandatory.  Judge England relied heavily on <u>In re Dannenberg</u>, 34 Cal. 4th 1061,

15  1098, 23 Cal. Rptr. 3d 417, 443 (2005) which admittedly, and as previously set forth, vested

16  almost unlimited, unreviewable discretion within the BPT when it came to determining parole

17  eligibility.  However, even assuming that the "old" Supreme Court paradigm regarding creation

18  of a liberty interest (mandatory act and underlying factual predicates) remains the analytical

19  framework in which to judge the creation of right-to-parole liberty interests, <u>see</u> e.g., <u>Board of</u>

20  <u>Pardons v. Allen</u>, 482 U.S. 369, 378, 107 S. Ct. 2415, 2421(1987) (mandatory language in a

21  parole statute creates a "presumption of release" and gives rise to a liberty interest), California

22

23         [3] The undersigned must follow <u>Biggs</u>, not simply because the decision makes sense, but
    because the undersigned is bound to follow it as well.  While it might be possible for the
24  undersigned to deviate from <u>Biggs</u> if a higher federal authority had repudiated the case holding
    directly or in principle, i.e., either the Ninth Circuit en banc, or the Supreme Court, the
25  undersigned does not have that ability to ignore it simply because the California Supreme Court
    has issued a decision seemingly contrary to one it issued a few years ago.  The Ninth Circuit must
26  inform its lower court judges whether it is willing to depart from <u>Biggs</u>.

1  law, both before and after <u>Dannenberg,</u> finds that the California parole scheme for indeterminate

2  offenses does create a liberty interest.

3      In sum, the governing statute provides that the Board *must grant parole* unless it
determines that public safety requires a lengthier period of incarceration for the

4  individual because of the gravity of the offense underlying the conviction.
(Pen.Code, § 3041, subd. (b).) And as set forth in the governing regulations, the

5  Board *must set a parole date* for a prisoner unless it finds, in the exercise of its
judgment after considering the circumstances enumerated in section 2402 of the

6  regulations, that the prisoner is unsuitable for parole. (Cal.Code Regs., tit. 15, §
2401.)  Accordingly, parole applicants in this state *have an expectation that they*

7  *will be granted parole* unless the Board finds, in the exercise of its discretion, that
they are unsuitable for parole in light of the circumstances specified by statute and

8  by regulation.

9  <u>In re Rosenkrantz,</u>  29 Cal. 4th 616, 654, 128 Cal. Rptr. 2d 104, 138 (2003) (emphasis added).

10  It is difficult to conceive of words which mirror the requirements of the <u>Allen</u> mandatory-act-in

11  light-of-satisfied-factual-predicates paradigm more than the emphasized words of <u>Rosenkrantz</u>.

12  Indeed, <u>Allen</u> and <u>Rosenkrantz</u> use the same terminology, i.e. "presumption" of release and

13  "expectation" of release.  These are the words of liberty interest creation.  It is not material that

14  great discretion is vested within the administrative agency granting parole.  <u>Allen</u> <u>supra</u>. See <u>also</u>

15  the post-<u>Dannenberg</u> case of <u>In reDeLuna,</u>126 Cal. App. 4th 585, 591, 24 Cal. Rptr. 3d 643, 647

16  (2005):

17      Penal Code section 3041, subdivision (b) requires the Board to "set a release date
unless it determines that the gravity of the current convicted offense or offenses, or

18  the timing and gravity of current or past convicted offense or offenses, is such that
consideration of public safety requires a more lengthy period of incarceration for

19  this individual, and that a parole date, therefore, cannot be fixed at this meeting."
*This statute creates a conditional liberty interest for a prospective parolee.* (Cf.

20  <u>Rosenkrantz</u>, <u>supra</u>, 29 Cal.4th at p. 661, 128 Cal.Rptr.2d 104, 59 P.3d 174;
<u>McQuillion v. Duncan</u> (9th Cir.2002) 306 F.3d 895, 901-902.) (emphasis added)[4]

21

22      The undersigned can only find that California law is in disarray on the subject of liberty

23  interest created by the California parole statutes.  <u>Dannenberg</u> did not overrule <u>Rosencrantz,</u> and

24  _____

25      [4]<u>Dannenberg</u> did find that California prisoners had no liberty interest in a *uniform* parole
date, 34 Cal. 4th at 1098 (n.18), 23 Cal. Rptr. 3d at 443 (citing <u>Rosenkrantz)</u>; however, this is a
far cry from holding that the parole scheme as a whole does not create a conditional liberty

26  interest.

1  implied overrulings are extremely disfavored.  Scheiding v. Gen. Motors, 22 Cal. 4th 47, 478, 93

2  Cal. Rptr. 2d 342, 346 (2000).  Indeed, California cases after Dannenberg continue to find a

3  liberty interest and cite Rosencrantz.  Therefore, Biggs and McQuillion should not, and cannot, be

4  cast aside based on the ambiguities in California law unless the Ninth Circuit so holds.

5              *Analysis*

6              To put the BPT's findings in context, the court will set forth the factual

7  background of petitioner's offense which was read at the May 3, 2001, hearing:

8  "On September 22nd, 1982, the prisoner, Steven Rodriguez, shot and killed
   Alejandro Nava (phonetic).  Mr. Nava, the victim, was having a relationship with
9  inmate Rodriguez's estranged girlfriend since he left Gonzalez, mother of the
   inmate's child, which angered the prisoner.  The victim and Ms. Gonzalez lived
10 next door to each other and over a period of a few months, had developed a
   relationship.  Inmate Rodriguez's daughter, Vanessa Gonzalez, age two and a half,
11 informed inmate Rodriguez that the victim was staying over at the apartment.
   Shortly thereafter inmate Rodriguez told Ms. Gonzalez that the victim was
12 "dead."  With the assistance of a fellow gang member, Gilbert Lacosta, Jr.
   (phonetic)–And he also had a CDC number D-55064.  Inmate Rodriguez set the
13 victim up with the purpose of a fight.  Lacosta testified that inmate Rodriguez said
   nothing about wanting to shoot the victim and claimed that he, Lacosta, did not
14 see inmate Rodriguez with a gun the previous evening.  Inmate Rodriguez and
   crime partner Lacosta were aware of the usual time the victim left for work and
15 waited for him.  Crime partner Lacosta asked the victim for a ride to get to
   [inaudible] and in turn promising him some form of help.  Crime partner Lacosta
16 and the victim left in the car and after a few blocks, crime partner Lacosta asked
   the victim to pull over to the curb.  Inmate Rodriguez was "lying in wait" (and
17 that's in quotes) "and as the car stopped at the curb, prisoner Rodriguez ran to the
   passenger's door, pushed crime partner Lacosta's head out of the way and shot the
18 victim three times.  Crime partner Lacosta and inmate Rodriguez fled.  The victim
   received multiple gunshot wounds to the back and shoulder.  He was treated at the
19 scene, transported to Beverly Hospital, where he was pronounced dead on arrival.
   Crime partner Lacosta was not charged as a co-defendant.  Inmate Rodriguez said
20 that crime partner Lacosta testified against him in court.  As a result, the criminal
   charges against inmate Lacosta were dismissed."
21
              And then I would like to read the prisoner's version which goes as follows:
22
   "Prisoner Rodriguez said the offense summary as previously reported was
23 basically accurate.  He made plans to confront the victim and beat him up for
   carrying on with his estranged girlfriend.  The victim pulled to the curb with crime
24 partner Lacosta.  Inmate Rodriguez was overcome with rage and jealousy.  He had
   intended on physically assaulting the victim, but was unable to do anything except
25 pull out his gun and fire it."

26 Respondent's Answer, Exhibit A, pp. 36-39.

1    The BPT found petitioner unsuitable for the following reasons:

2 This Panel has reviewed all information received from the public and relied on the following circumstances in concluding that Mr. Rodriguez is not suitable for

3 parole and that he would pose an unreasonable risk of danger to society and a threat to public safety if he were to be released from prison at this time.  Many

4 factors were considered.  First and foremost, the commitment offense and its nature.  This offense was carried out in an especially cruel manner, a manner

5 which demonstrates a callous disregard for human suffering.  Also, this offense had a high degree of planning involved.  It was a calculated assault on the victim.

6 The motive for this crime is very trivial in relation to the offense.  These conclusions are drawn from the Statement of Facts wherein the prisoner, while

7 estranged from his common law spouse, became aware of a relationship that the–his spouse was involved with the victim.  Apparently he [inaudible]–he

8 planned to confront the victim and included a crime partner to lure the victim.  He armed himself with a firearm and when the victim was lured to the designated

9 ambush location, the inmate suddenly confronted the victim and shot him multiple times resulting in the death of human being.  The prisoner, at the time of

10 commitment offense, was involved in an escalating pattern of criminal conduct. He was involved in substance abuse and had several arrests involving substance

11 abuse.  He–Excuse me for one second.  He had been placed on probation on one matter.  He had also been placed on court diversion on another matter.  At one

12 point, his Whittier arrest in 1980 had probation broken; he served 90 days in jail. He seems to have a problem with substance abuse and drug abuse and driving a

13 vehicle on public highways endangering a great many people.  There is also reference made in our report to a connection between him and the local gang in

14 the city of Whittier, known as the Sunrise Gang.  With regard to his institutional behavior, this inmate has programmed in a limited manner.  Although he has

15 worked at–tried to work at a couple of different vocations he has yet to complete in total any vocation.  During his incarceration time, he has received four 128s

16 and one 115 although he has received no disciplinaries since his last parole consideration hearing.  In regard to the psychological evaluation done by Dr.

17 Beermann that's dated June 30th, 2000, it is the view of the Panel, that report is inconclusive and I will read from the Assessment of Dangerousness:

18

19 "In my opinion, Mr. Rodriguez does not pose more than a normal risk factor whether in or out of a controlled environment, as long as he stays away from drugs.  No other risk factors are concurrent."

20

21 It goes on to say that inmate has matured a great deal since his incarceration in 1983, when he was 21, has had only one 115 [inaudible].  Inmate is very articulate

22 and cooperative and he states that he would be a reasonable candidate for parole. This Panel is concerned that the–as pointed out by the doctor, the risk factor

23 involving drugs.  As long as he stays away from drugs, this Panel feels that he needs to do more work in a self-help program such as NA or AA to enhance his

24 chances for parole suitability.  With regards to parole plans, the inmate has not substantial parole plans.  This Panel notes that the District Attorney from the

25 County of Los Angeles is opposed to parole suitability.  This Panel makes the following findings that the inmate needs to continue participation in self-help

26 programming in order to face, discuss, understand and cope with stress in a non-destructive manner.  He also needs additional time in order to fully understand

and deal with the causation factors which to [sic] led to committing the crime. Until progress is made, the inmate continues to be a threat to others. Some of the gains that the prisoner had made are appreciated by this Panel and he must remain on that path. I'm referring to his recent participation with the self-help program. He should commended [sic] for at least a couple of things in that he has achieved his GED while incarcerated and [inaudible] and again we appreciate the fact that he's completed some phases of the various vocation programs. Again, he has to complete at least one of those vocations to enhance his ability to gain employment if found suitable for parole. I will mention a recent participation with NA in 1999 with perfect attendance during the phases of the programming. He has take part in other programs such as the Non-Violent Confrontation Resolution. However, these [inaudible] of his behavior do not allay the factors of unsuitability. In reaching our decision, the Hearing Panel finds that the prisoner has been convicted of murder and it is not reasonable to think that parole will be granted in a hearing during the next three years.

Respondent's Answer, Exhibit A, pp. 53-57.

In finding petitioner unsuitable, the panel relied on several unchanging factors such as the circumstances of the crime, petitioner's criminal record and his history of substance abuse. Because of the length of time that had passed since petitioner's commitment offense (18 years as of the 2001 hearing) and because this was petitioner's third suitability hearing, the court finds that these factors standing alone had lost any predictive value, i.e., whether the unchanging factors constitute "some evidence." Pursuant to Biggs, this court must consider whether these factors still had any predictive value based on petitioner's post-conviction conduct.

As indicated above, the panel found petitioner unsuitable because of his criminal record. At the hearing the panel mentioned two arrests as a juvenile for interfering with a police officer who was conducting an investigation and for failing to stop at a traffic signal. Respondent's Answer, Exhibit A, p. 40. These arrests apparently did not result in convictions. Id. Petitioner's two adult convictions were for operating a motor vehicle while under the influence of drugs. Id., pp. 40, 64.

Petitioner's prior convictions did not involve violence. See § 2502(c)(2). Nor did these convictions demonstrate a significant history of violent crime. See § 2402(d)(6). "Some evidence" did not support the panel's finding that petitioner's criminal history made him unsuitable.

15

1    The panel also found that petitioner's history of substance abuse made him

2 unsuitable.  Petitioner's history of substance abuse was demonstrated by his convictions for drug-

3 related driving under the influence.  Petitioner used marijuana, PCP and alcohol.  Respondent's

4 Answer, Exhibit A, p. 43.  The psychological report prepared by Dr. Beerman for the hearing also

5 stated that petitioner admitted an extensive pre-prison history of illegal drug use.  Id., p. 101.

6    In determining whether petitioner's pre-conviction substance abuse had any

7 predictive value, i.e., can stand as some evidence, the court must consider whether petitioner

8 sought and received treatment for this problem following his imprisonment.  The panel stated that

9 petitioner had participated in Narcotics Anonymous since his last suitability hearing in 1999.  Id.,

10 p. 46.  Petitioner had also completed a Substance Abuse Program in March 1999.  Id., p. 46.  In

11 his psychological report, Dr. Beerman stated petitioner's prognosis for a stable life was excellent

12 if he did not use drugs.  Id., p. 102.  Dr. Beerman also stated that petitioner did not pose more than

13 a normal risk factor whether in or out of a controlled environment as long as he did not use drugs.

14 Id.  He stated that petitioner would be a reasonable candidate for parole and made no further

15 recommendations.  Id.  Respondent has also provided the court with the psychological evaluation

16 prepared for petitioner's 1997 suitability hearing by Dr. McDill.  In this report, Dr. McDill states

17 that petitioner had been attending NA for 7 years and had attended weekly from 1987 to 1994.

18 Id., p 104.

19    The record indicates that petitioner attended NA regularly for many years.  The

20 psychological report prepared for the 2001 hearing did not state that petitioner required further

21 treatment for his substance abuse problem.

22    It is not the province of this court to re-weigh the evidence before the BPT, and the

23 undersigned must be careful not to substitute his opinion on the evidence for a "lack of some

24 evidence."  Nevertheless, deference has its limits, and those limits have been surpassed here.

25 "Some evidence" on an unchanging factor cannot be found when the BPT's conclusion is starkly

26 contrary to the evidence of record.

1    The panel also relied on the circumstances of the commitment offense to find

2  petitioner unsuitable.  The panel found that the commitment offense demonstrated a high degree

3  of planning and calculation (§ 2402(c)(1)(B)), a callous disregard for human suffering (§

4  2402(c)(1)(D)), and that the motive was very trivial (§ 2402(c)(1)(E)).  Based on the

5  circumstances of the offense described above, the court finds that these factors, in the abstract,

6  were supported by "some evidence."  In order to determine whether continued reliance on this

7  factor violated petitioner's liberty interest, i.e., whether it still qualified as "some evidence," the

8  court must consider petitioner's relevant conduct following his incarceration.

9    At the time of the 2001 hearing, petitioner's classification score had been zero

10  since 1994.  Respondent's Answer, Exhibit A, p. 45.  Petitioner completed the Anger

11  Management Program in July 1999 which consisted of ten 1 ½ hour sessions.  Id., p. 46.  In 1991

12  he completed Breaking Barriers and Non-Violent Conflict Resolution.  Id., p. 46.  Petitioner had

13  received one rules violation report and that was in 1986 for possession of weapon stock.  Id., p.

14  46.  Petitioner had received four counseling chronos during his incarceration, none since 1985.  Id.

15  In his report, Dr. Beerman discussed his diagnostic impressions of petitioner:

16    DIAGNOSTIC IMPRESSIONS:

17    Axis I: No symptoms noted.
     Axis II: No symptoms noted.
18    Axis III: No evidence.
     Axis IV: Incarceration.
19    Axis V: GAF=85.

20    The inmate is currently not receiving any Mental Health Treatment, nor has he in
     the past.  He made good eye contact and was very cooperative during the
21    interview.  He appears very stable and his affect was normal.  There was no
     evidence that he had suicidal or homicidal ideation.  His judgment and insight
22    appear normal.  No mental health treatment is indicated at this time.  He is not
     taking any psychotropic medication and his prognosis for continuing a stable life
23    is excellent if he does not use drugs.

24    REVIEW OF LIFE CRIME: The inmate's record prior to the Instant Offense was
     not serious and consisted of PCP-related offenses–Driving Under the Influence
25    and Interfering with a Police Officer.  The Instant Offense was a homicide
     committed in the heat of jealousy.  He and his wife had broken up for a few
26    months prior to the offense.  His three-year-old daughter had told him that her

17

mother had slept with a boyfriend and the subject confronted his ex with this.  She laughed at him and he felt enraged.  At the time of the murder he was on PCP and alcohol.

ASSESSMENT OF DANGEROUSNESS: In my opinion Mr. Rodriguez does not pose more than a normal risk factor whether in or out of a controlled environment, as long as he stays away from drugs.  No other risk factors are apparent.

In my opinion, he has matured a great deal since his incarceration in 1983, 16 years ago, at age 21.  He has had only one 115, and that was 14 years ago.  This inmate was very articulate and cooperative, and in my opinion, would be a reasonable candidate for parole.

CLINICIAN OBSERVATION COMMENTS AND RECOMMENDATIONS: There are no further recommendations at this time.

Respondent's Answer, Exhibit A, p. 102.

In finding petitioner unsuitable, the BPT also relied on the Life Prisoner Evaluation prepared by Correctional Counseler Hawkins for the 2001 hearing.  Counselor Hawkins concluded that petitioner posed an unpredictable degree of threat if released:

Considering the commitment offense, prior criminal record, adjustment to prison, psychiatric reports and the efforts made by the prisoner to conform to the requirements of prison this writer believes that the prisoner poses an unpredictable degree of threat if released at this time.  The prisoner does assume responsibility for this crime, however, this writer does not sense a degree of remorse for his actions.

Id., p. 64.

Dr. Beerman's report and petitioner's lack of a prison disciplinary record indicate that petitioner would not pose an unreasonable risk of danger to society if released on parole.  However, in his report Counsel Hawkins stated that he did not sense a degree of remorse by petitioner for his actions.  Demonstrating signs of remorse is a factor demonstrating parole suitability.  Section 2402(d)(3).  A lack of remorse could lend predictive value to the circumstances of the commitment offense.

In response to Counselor Hawkins' report, petitioner submitted a written statement which was apparently part of the record considered by the BPT at the 2001 hearing.  In this statement, petitioner stated,

1    C.C.I. Hawkins stated, "This writer does not sense a degree of remorse for his
     action" our interview for this report was based on a 15 minute conversation in
2    which no questions were asked regarding my crime or my attitude towards this
     crime I'm incarcerated before. I've been housed at F.S.P. for 3 yrs and at no time
3    have I ever talked to CCI Hawkins about my crime.  I have never seen CCI
     Hawkins before this interview. Yet, CCI Hawkins feels that he is qualified to
4    sense certain emotions from me.

5    Respondent's Answer, Exhibit A, p. 63.

6           Petitioner did not appear at the 2001 hearing because he did not believe he would

7    receive a fair hearing because of the "no parole policy" of the BPT and Governor Davis.

8    Petitioner's lawyer read a written statement by petitioner regarding his position into the record at

9    the hearing.  Id., p. 32.

10          In his report, Counselor Hawkins did not discuss the basis for his opinion that

11   petitioner did not have sufficient remorse.  However, because petitioner did not appear at the

12   hearing to discuss this issue with the BPT, his written statement is insufficient to refute Counselor

13   Hawkins' conclusion regarding this matter.  While Dr. Beerman's report did not specifically

14   discuss the issue of remorse, it did not find that petitioner lacked remorse or other appropriate

15   insight into his offense.  Based on the record, and even if slight, Counselor Hawkins' conclusory

16   statement was "some evidence" that petitioner lacked remorse.

17          The panel found that petitioner had programmed in a limited manner.  Section

18   2402(d)(8) (prisoner has developed marketable skills that can be put to use upon release).  As far

19   as vocational training, petitioner completed 1280 hours as a shear operator.  Id., p. 45.  He had

20   also participated in vocational welding, although there was no date on that certification.  Id.

21   Petitioner apparently received his certification in shop organization in 1988.  Id., pp. 45-46.  He

22   also received a certification in press operation and plate making in 1988.  Id., p. 46.

23   Commissioner Welch later stated that petitioner had gained employable skills in sheet metal

24   fabrication and welding.  Id., p. 46.

25   \\\\\

26   \\\\\

19

1   The record described above indicates that petitioner had developed marketable

2   skills during his incarceration.  For this reason, the court finds that the BPT's finding that he had

3   programmed in a limited manner was not supported by some evidence.

4   The panel also found that the psychological report was "inconclusive" regarding

5   petitioner's ability to function if released on parole.  Section 2402(d)(9) (institutional behavior

6   indicates enhanced ability to function within the law upon release).  The panel was concerned by

7   Dr. Beerman's comments that petitioner was a reasonable candidate for parole only if he remained

8   drug free.  Respondent's Answer, Exhibit A, p. 55.  The panel concluded that petitioner needed to

9   do more self work in NA or AA to enhance his chances for parole suitability.  Id., pp. 55-56.

10  As discussed above, petitioner had regularly attended NA for several years.  Dr.

11  Beerman did not find that petitioner required additional drug treatment in order to be suitable for

12  parole.  Dr. Beerman actually concluded that petitioner was a reasonable candidate for parole.  For

13  these reasons, the court finds that the panel's finding that petitioner's psychological report did not

14  support a suitability finding was not supported by some evidence.

15  Finally, the BPT also found that petitioner did not have realistic parole plans.

16  Section 2402(d)(8) (prisoner has made realistic plans for release).  Petitioner had apparently

17  represented to the BPT at some point that he would live with his sister upon release and that she

18  would help him find employment.  However, the record contained no letters from his sister stating

19  that petitioner could live with her or that she had found him employment.  Answer, Exhibit A, p.

20  52.  Based on this record, the court finds that the BPT's finding that petitioner did not have

21  realistic support plan was supported by some evidence.

22  In the petition, petitioner argues that the panel ignored the letter from his brother

23  stating that he would allow petitioner to live in one of the houses he owned.  Petition, Exhibit J.

24  In this letter, petitioner's brother also stated that he would purchase a car for petitioner and

25  provide him with financial assistance.  Id.  The panel and petitioner's attorney were both

26  apparently unaware of this letter during the 2001 hearing.  The court cannot fault the panel for

20

1    failing to consider this letter which was apparently not in petitioner's file.  Had petitioner attended

2    the hearing he could have brought this letter to the panel's attention.  Accordingly, the court does

3    not find that this letter undermines the panel's finding that petitioner lacked realistic parole plans.

4         Although only two of the factors cited by the BPT were supported by some

5    evidence, this was sufficient grounds on which to find petitioner unsuitable for parole.  Because

6    the denial of this claim by the Superior Court was not an unreasonable application of clearly

7    established Supreme Court authority, this claim should be denied.

8              B.  Improper Classification

9         Petitioner argues that the panel improperly characterized his offense as first degree

10   murder because the panel used language describing first degree murder to support the denial.

11        It is clear from the transcript of the hearing that the panel understood that petitioner

12   was convicted of second degree murder.  The language petitioner is apparently referring to is the

13   language contained in the regulations, set forth above, for considering parole suitability, i.e. the

14   murder was carried out in a dispassionate and calculated manner, such as an execution-style

15   murder.  § 2402(c)(1)(B).  Petitioner also cites the panel's description of the offense which stated

16   that petitioner was "lying in wait."

17        In In re Rosenkrantz, 29 Cal. 4th 616, 128 Cal. Rptr. 2d 104 (2002) (a case

18   involving parole rescission of a second degree murderer), the California Supreme Court did

19   permit evidence of planning and premeditation to be taken into account in making a second degree

20   murder parole decision even if the jury rejected a first degree murder conviction.  Nevertheless,

21   the parole decision makers should not routinely escalate second degree murder into a first degree

22   murder by parole fiat.

23            In some circumstances, a denial of parole based upon the nature of
             the offense alone might rise to the level of a due process
24           violation–for example where no circumstances of the offense
             reasonably could be considered more aggravated or violent than the
25           minimum necessary to sustain a conviction for that offense.  Denial
             of parole under these circumstances would be inconsistent with the
26           statutory requirement that a parole date normally shall be set "in a

manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public . . . ." (Pen.Code, § 3041, subd. (a).)  "The Board's authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is 'normally' to be granted.  Otherwise, the Board's case-by-case rulings would destroy the proportionality contemplated by Penal Code section 3041, subdivision (a), and also by the murder statutes, which provide distinct terms of life without possibility of parole, 25 years to life, and 15 years to life for various degrees and kinds of murder. (Pen.Code, § 190 et seq.)  Therefore, a life term offense or any other offenses underlying an indeterminate sentence must be *particularly egregious* to justify the denial of a parole date."  ( In re Ramirez, supra, 94 Cal. App. 4th at p. 570, 114 Cal. Rptr. 2d 381.)

In re Rosenkrantz, 29 Cal. 4th at 683, 128 Cal. Rptr. 2d at 161 (emphasis added).

The caution of the California Supreme Court in this regard (even though it ultimately found sufficient evidence to take the Rosenkrantz murder out of the ordinary) is persuasive in the context of federally reviewing for some evidence under an AEDPA standard herein.  In the instant case, the circumstances of the offense suggest an execution style murder. Petitioner "set up" his victim then shot him from close range.  Therefore reliance on this factor was appropriate.

Petitioner argues that the BPT violated his plea agreement by improperly characterizing his second degree murder conviction as a first degree murder conviction.  This claim is really a restatement of the claim directly alleging that the BPT improperly characterized petitioner's offense.  For that reason, the court will not independently review this claim.

After independently reviewing the record, the court finds that the denial of this claim by the California Supreme Court was not an unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim should be denied.

C.  Equal Protection

Petitioner argues that similarly situated prisoners have been released on parole sooner than him.  "The Constitution permits qualitative differences in meting out punishments and there is no requirement that two persons convicted of the same offense receive identical

1 sentences." Williams v. Illinois, 399 U.S. 235, 243, 90 S. Ct. 2018, 2023 (1970).  Parole

2 considerations require only a rational relationship to legitimate state interests.  McGinnis v.

3 Royster, 410 U.S. 263, 270, 93 S. Ct. 1055, 1059-60 (1973).

4          In order to prevail on this claim, petitioner must demonstrate that similarly situated

5 prisoners have been released on parole sooner than him.  See McQueary v. Blodgett, 924 F.2d

6 829, 835 (9th Cir. 1991).  In other words, petitioner must demonstrate that prisoners convicted of

7 second degree murder based on similar circumstances have been released on parole.  In support of

8 this claim, petitioner cites the cases of other inmates who were released on parole whose crimes

9 were similar to his but were not characterized as callous and cruel.  As discussed above, the

10 grounds to support the panel's finding of unsuitability was petitioner's lack of realistic parole

11 plans and lack of sufficient remorse.  To succeed on his equal protection claim at this point,

12 petitioner would have to demonstrate that inmates with equally vague parole plans and remorse

13 characteristics were released.  This he has not done.

14          After independently reviewing the record, the court finds that the denial of this

15 claim by the California Supreme Court was not an unreasonable application of clearly established

16 Supreme Court authority.  Accordingly, this claim should be denied.

17          D.  ADA

18          Petitioner argues that the panel violated the ADA when it found him unsuitable for

19 parole based on his prior drug addiction.  As discussed above, the panel's finding that petitioner

20 required further treatment for his past substance abuse was not supported by some evidence.  This

21 conclusion moots petitioner's ADA claim.

22          In any event, in Thompson v. Davis, 295 F.3d 890 (9th Cir. 2002) the Ninth Circuit

23 found that Title II of the ADA did not categorically bar a state parole board from making an

24 individualized assessment of the future dangerousness of an inmate by taking into account the

25 inmate's disability.  295 F.3d at 898 n. 4.  "A person's disability that leads one to a propensity to

26 commit crime may certainly be relevant in assessing whether the individual is qualified for

1  parole." Id.

2        After independently reviewing the record, the court finds that the denial of this

3  claim by the California Supreme Court was not an unreasonable application of clearly established

4  Supreme Court authority.  Accordingly, this claim should be denied.

5        E.  Vague

6        Petitioner argues that the language describing the factors set forth in § 2402(c)(1),

7  i.e., the gravity of the offense, is unconstitutionally vague.  The BPT relied on § 2402(c)(1)(B),

8  (D) and (E) to find petitioner unsuitable.

9        A statute (or regulation) is void for vagueness "if it fails to give adequate notice to

10 people of ordinary intelligence concerning the conduct it proscribes, or if it invites arbitrary and

11 discriminatory enforcement."  United States v. Doremus, 888 F.2d 630, 634 (9th Cir. 1989).  The

12 threshold question in a vagueness challenge "is whether to scrutinize the statute for intolerable

13 vagueness on its face or whether to do so only as the statute is applied in a particular case."

14 Schwarzmiller v. Gardner, 752 F.2d 1341, 1346 (9th Cir. 1984).

15       Where speech or other constitutionally protected conduct is not the subject of a

16 statute or regulation and is not otherwise implicated in the case and if related constitutional rights

17 are not expressly invoked in a challenge to facial validity, the court need only examine the

18 vagueness challenge under the facts of a particular case and decide whether, under a reasonable

19 construction of the statute or regulation, the conduct in question is prohibited.  United States v.

20 Hogue, 752 F.2d 1503, 1504 (9th Cir. 1985).  Finally, "[i]n scrutinizing a statute for intolerable

21 vagueness as applied to specific conduct, courts must 'take the statute as though it read precisely

22 as the highest court of the state has interpreted it."  Schwartzmiller, 752 F.2d at 1348.

23       In the instant case, speech is in no way implicated.  Accordingly, the court will

24 determine whether, under a reasonable construction, petitioner had notice that the at-issue factors

25 would apply to him based on the circumstances of his commitment of offense.

26 \\\\\

1      Section 2402(c)(1)(B) provides that a prisoner is unsuitable if the commitment

2  offense was carried out in a dispassionate and calculated manner, such as an execution-style

3  manner.

4      In In re Smith, 114 Cal. App. 4th 343, 7 Cal. Rptr. 3d 655 (2003) the California

5  Court of Appeal described factors which would characterize § 2402(c)(1)(D), i.e. an offense

6  carried out in a manner demonstrating an exceptionally callous disregard for human suffering:

7  "There is no evidence that Smith acted with cold, calculated dispassion; or that he tormented,

8  terrorized, or injured Garner before deciding to shoot her; or that he gratuitously increased or

9  unnecessarily prolonged her pain and suffering." 114 Cal. App. 4th at 367, 7 Cal. Rptr. 3d at 673.

10      Section 2402(c)(1)(E) provides that a prisoner is not suitable if the motive for the

11  crime is inexplicable or very trivial in relation to the offense.

12      As previously set forth at length, the gist In re Dannenberg involves defining the

13  role of the BPT in establishing the gravity of the offense.  Instead of the Rosenkrantz standard of

14  "particularly egregious" in terms of assessing the criteria set forth above, the BPT need now only

15  find that "the violence or viciousness of the inmate's crime must be more than "minimally

16  necessary to convict him of the offense for which he is confined."  In re Dannenberg, 34 Cal. 4th

17  at 2095, 23 Cal. Rptr. 3d at 440.  The criteria were difficult enough to apply in the first place just

18  based on their wording, yet as worded with the Rosenkrantz definition of "particularly egregious,"

19  an inmate and a BPT official would have sufficient understanding to apply the regulatory sections.

20  That is, generally an ax murder accompanied by torture before death could easily be viewed as

21  "particularly egregious" because such murders are clearly out of the norm, i.e., fortunately, they

22  do not happen with great frequency and they involve a more callous disregard for life and

23  suffering.  Although every murder is tragic and most senseless in retrospect, a shooting arising out

24  of the passions of a longstanding simmering dispute would not normally appear to fit the

25  egregious category.  But, according to Dannenberg, every murder could fit the category "more

26  than minimally necessary to convict" because there is no set of "minimally necessary

1  circumstances" set forth in the law.  No person could actually know how the regulatory would be

2  applied in a particular case because application is so arbitrary, and depends entirely on the

3  subjective, personal opinions of the decisionmakers.  The court will not repeat its entire previous

4  Dannenberg analysis here.  However, for those reasons, the "gravity" regulations have become

5  indecipherable in terms of their application—they can mean anything to anybody.  That is

6  unconstitutional vagueness.

7         The undersigned would normally attempt to find examples of similar vagueness in

8  the case law; however, the fact that such regulations are unconstituionally vague does not matter

9  in this case.  The undersigned has found that the BPT had sufficient (barely) evidence in other

10  areas such that the denial of parole eligibility was warranted in any event.  Petitioner will obtain

11  no relief on account of declaring the regulatory criteria vague.  Thus, the undersigned terminates

12  the analysis here.

13         Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

14  writ of habeas corpus be denied.

15         These findings and recommendations are submitted to the United States District

16  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

17  days after being served with these findings and recommendations, any party may file written

18  objections with the court and serve a copy on all parties.  Such a document should be captioned

19  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

20  shall be served and filed within ten days after service of the objections.  The parties are advised

21  that failure to file objections within the specified time may waive the right to appeal the District

22  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

23  DATED:   7/20/05

24                                  /s/ Gregory G. Hollows

25                                  _____
                                    GREGORY G. HOLLOWS
                                    UNITED STATES MAGISTRATE JUDGE

26  ggh:kj - rod2119.157